IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| PC CONNECTION, INC. and GOVCONNECTION, INC., | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | Case No.: PWG-17-635 |
| | * |
| CHRISTOPHER MEREOS, | |
| | * |
| Defendant. | |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' renewed Emergency Motion for *Ex Parte* Temporary Restraining Oder, which seeks injunctive relief to protect trade secrets and confidential information allegedly taken by the companies' former employee, Defendant Christopher Mereos. Pls.' Mot., ECF No. 2. Because Mereos has been served and failed to appear at a hearing held on March 21, 2017, I now construe the Motion as a Motion for a Preliminary Injunction. At the aforementioned hearing, I held that the Plaintiffs had demonstrated a likelihood that Mereos violated an enforceable non-disclosure agreement by taking proprietary information from the company, which if disclosed to the companies' competitors would likely result in irreparable harm to their business. Accordingly, I granted Plaintiffs preliminary-injunctive relief. This Memorandum Opinion and Order memorializes that ruling.

## Background

Plaintiff GovConnection, Inc. ("GovConnection") is the wholly-owned subsidiary of Plaintiff PC Connection, Inc. ("PC Connection"). Together, the companies sell software,

hardware, and services to private businesses and government entities, with GovConnection handling the companies' public-sector work. Verified Compl. ¶ 15, ECF No. 1. On September 23, 2011, GovConnection hired Mereos as a Sales Support Associate and promoted him to Account Manager in 2013. *Id.* ¶¶ 20–21. As part of Mereos's in-processing, he signed an Employee Agreement ("Agreement") which, among other things, contained the following nondisclosure agreement (as well as a non-competition agreement not presently at issue):

> 2.1  <u>Nondisclosure and Nonuse of Confidential Information</u>.  I agree that all Confidential Information, as defined bellow, which I create or to which I have access as a result of my employment and other associations with the Company is and shall remain the sole and exclusive property of PC Connection.  I agree that, except as required for the proper performance of my regular duties for the Company, as expressly authorized in writing in advance by the Company, or as required by applicable law, I will never, directly or indirectly, use or disclose any Confidential Information.  I understand and agree that this restriction shall continue to apply after termination of my employment or this Agreement, howsoever caused. . . .
>
> 2.2.  <u>Use and Return of Documents</u>.  I agree that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of PC Connection and any copies (including without limitation electronic), in whole or in part, thereof (the "Documents" and each individual, a "Document"), whether or not prepared by me, shall be the sole and exclusive property of the Company. Except as required for the proper performance of my regular duties for PC Connection or as expressly authorized in writing in advance by the Company, I will not copy and Documents or remove any Documents or copies or derivatives thereof from the premises of the Company.  I will safeguard, and return to the Company immediately upon termination of my employment, and/or at such times specified by the Company, all Documents and other property of the Company, and all documents, records and files of its customers, subcontractors, vendors, and suppliers ("Third-Party Document" and individually a "Third-Party Document"), as well as all other property of such customers, subcontractors, vendors and suppliers, then in my possession or control. . . .

Agr. ¶ 2, Verified Compl. Ex. A., ECF No. 1-2.

According to GovConnect Vice President of Government Sales (and Mereos's supervisor), Jeffrey Trent, who testified at the hearing, at some point during Mereos's tenure, the

employee's performance and attendance became a concern, and the company placed him on a performance improvement plan designed to help him address his deficiencies. On February 17, 2017, Mereos informed Trent that he wished to resign his employment because he did not believe that he would ever be taken off the improvement plan. At the time of his resignation, Mereos dishonestly told Trent that he planned to take a job at his uncle's property-management company. That same day, Mereos participated in an exit interview and signed a Termination Certification, as required by the Agreement. Verified Compl. ¶ 29; Termination Certification, Verified Compl. Ex. B., ECF No. 1-3; Agr. ¶ 5. By signing the Termination Certification, Mereos untruthfully represented:

> I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, . . . materials, equipment, other documents or property, or reproductions of any of the aforementioned items, including without limitation any such items in electronic form, belonging to PC Connection, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").
>
> I further certify that I have complied with all of the terms of the Company's Employee Agreement signed by me (the "Agreement") . . . .
>
> I further agree that, in compliance with the Agreement, I will preserve as confidential all Confidential Information (as defined therein), including without limitation, trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, . . . databases, . . . customer lists, business plans, financial information or other subject matters pertaining to any business of the Company or any of its employees, customers, consultants or licenses.

Termination Certification.

Trent testified that a routine review of Mereos's work-email account revealed that emails had been deleted from the two weeks prior to Mereos's resignation. GovConnection recovered the deleted emails from its backup systems and determined that Mereos had sent at least four hundred emails to unsecured, external email addresses, many of them to the email address

maryland44@outlook.com.  *See* Verified Compl. ¶ 31.  Mereos attached to these emails proprietary information such as his own and other salespersons' customer lists containing customer email addresses and nicknames; customer email communications; spreadsheets generated from a customer-relationship-management (CRM) site called CallBack that detailed expiration dates for customers' software licenses, price-margin data, and GovConnection's assessment of the likelihood that the company would secure deals with particular customers; and login information.  *See* Verified Compl. ¶ 33.  Trent testified that the information contained in the emails, if used in a way that violated the Agreement, could provide GovConnection's competitors a roadmap for stealing the company's business by allowing competitors to undercut license-renewal efforts; focus their sales efforts on customers with whom GovConnection has less established relationships; and take advantage of price-margin information.

      Based on information provided by Mereos's wife, Vicki Mereos, during GovConnection's efforts to effect service, the company learned that Mereos had taken a job with Lexmark, a manufacturer that sells its products through resellers, including GovConnection and its competitors.  Further review of the information that Mereos forwarded to external email accounts identified a spreadsheet that detailed every GovConnection quote involving a Lexmark product since 2010, a spreadsheet that could only have been generated through a specific search of the CRM database using the keyword "Lexmark."  Plaintiffs' counsel Erik Winton spoke to Lexmark's General Counsel, who confirmed that the company had hired Mereos but without knowledge that Mereos was subject to a non-competition agreement.  He iterated that Lexmark did not wish to jeopardize its business relationship with GovConnection.  Shortly thereafter, Lexmark's General Counsel notified Winton that the company had terminated Mereos's employment for failure to disclose his contractual obligations to GovConnection.  Consequently,

GovConnection does not know if Mereos has secured employment elsewhere or what he has done with the company's proprietary information.

On March 6, 2017, Plaintiffs filed a Verified Complaint along with an Emergency Motion for *Ex Parte* Temporary Restraining Oder. Verified Compl.; Pls.' Mot. I denied without prejudice Plaintiffs' request for an emergency *ex parte* hearing, holding that they had failed to justify their failure to notify Mereos of the proceeding pursuant to Fed. R. Civ. P. 65(b)(1)(A)'s requirements. ECF No. 7. But I scheduled a hearing for the following week and ordered the Plaintiffs to provide Mereos with actual knowledge of the proceedings. *Id.* Inclement weather delayed the hearing until March 21, 2017. ECF No. 11. At the hearing, I determined that Mereos was attempting to evade GovConnection's multiple efforts to effect service but found that Plaintiffs had nonetheless done so by serving Vicki Mereos, who accepted service on Mereos's behalf, *see* ECF No. 6, and by leaving the relevant papers with an individual that GovConnection's process server visually identified as Mereos using a photograph provided by the company, *see* ECF No. 12. Accordingly, since Mereos had actual knowledge of but failed to attend the hearing, I determined that the Court could issue a preliminary injunction upon a sufficient evidentiary showing by the Plaintiffs. *See* Fed. R. Civ. P. 65(a)(1).

### Standard of Review

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). As a preliminary injunction is "an extraordinary remedy . . . [, it] may only be rewarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the plaintiff

must "establish that [1] he is likely to succeed on the merits, [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] the balance of equities tips in his favor, and [4] an injunction is in the public interest." *Id.* at 20; *see also Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

Prior to 2009, the Fourth Circuit followed a "balance of hardship" approach to preliminary injunctions, considering all four *Winter* elements, but "allow[ing] each requirement to be conditionally redefined" in a "flexible interplay" depending on how the other requirements were met. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009) (citing *Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977)). *Real Truth* invalidated this approach, however, and it "may no longer be applied" in the Fourth Circuit. *Id.* Plaintiffs must therefore satisfy each requirement as articulated. *Id.*

## Discussion

### Likelihood of Success on the Merits

Plaintiffs have robustly shown that they are likely to succeed on merits. New Hampshire law governs the Employee Agreement. Agr. ¶ 12. The Supreme Court of New Hampshire has analyzed the enforceability of non-disclosure agreements under the same test that the state's courts use to assess the enforceability of non-competition agreements. *ACAS Acquisitions (Precitech) Inc. v. Hobert*, 923 A.2d 1076, 1089 (N.H. 2007) ("While we have never expressly stated that the three-part test applicable to non-competition agreements applies to non-disclosure agreements, for purposes of this opinion we will assume that it does."). Under that test, an agreement is enforceable if "[1] the restriction is [no] greater than necessary to protect the legitimate interests of the employer; [2] . . . the restriction imposes [no] undue hardship upon the

employee; and [3] . . . the restriction is [not] injurious to the public interest. *Id.* at 1084 (citing *Merrimack Valley Wood Prods, Inc. v. Near*, 876 A.2d 757, 762 (N.H. 2005)). A business has "a legitimate interest in preventing its . . . sales [representative] from aiding in the marketing and sales of competitive products for a competitive business." *Id.* at 1090. The Agreement only prohibits the disclosure of "Confidential Information" created or accessed during an employee's tenure. Agr. ¶ 2.1. And the Agreement defines the operative term to include only information "not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any information, which if disclosed, would assist in competition against the Company." *Id.* ¶ 6. At this early stage in the litigation, I conclude that GovConnection's non-disclosure agreement is sufficiently narrowly tailored such that it does not strike me as overly broad, unduly burdensome, or injurious to the public.

Plaintiffs have also provided evidence that Mereos signed a non-disclosure agreement, Agr. 10, and that he falsely certified that he had complied with his obligations under the Agreement but had in fact forwarded customer lists and CallBack-generated spreadsheets to a non-secured, external email address, *see* Termination Certification; Verified Compl. ¶¶ 31, 33. These allegations, if true, would violate the Agreement's prohibition on "remov[ing] any Documents or copies or derivatives thereof from the premises of the Company," Agr. ¶ 2.2, and would run counter to Mereos's certification that he did not, upon his termination "have in [his] possession, nor . . . failed to return, any . . . records, data, . . . other documents or property, or reproductions of any of the aforementioned items, including without limitation any such items in electronic form belonging to PC Connection, Inc," Termination Certification. Accordingly, Plaintiffs have demonstrated a likelihood of success on the merits.

Irreparable Harm

As Mr. Trent's hearing testimony vividly illustrated, the customer lists, pricing data, licensing-expiration information, and probability estimates that Mereos appears to have misappropriated could provide GovConnection's competitors with a roadmap for stealing the company's business. Armed with the sort of information that Mereos allegedly forwarded to an external email account, other information-technology resellers could unjustly benefit from the data that GovConnection has generated through years of customer cultivation. *See* Verified Compl. ¶ 35. Competitors could also undercut the advantages that GovConnection possesses as an incumbent pursuing software-license renewals and cut advantageous deals based on the company's pricing data. Given the surreptitious manner in which Mereos obtained GovConnnection's proprietary information in the two weeks prior to his resignation and his subsequent deception concerning his actions, Verified Compl. ¶ 31, and especially in light of Mr. Trent's testimony that Mereos specifically and purposefully created spreadsheets containing information about a company that hired him shortly after his resignation, Plaintiffs have demonstrated a significant likelihood that irreparable harm will flow to their business in the absence of preliminary-injunctive relief.

Balance of Equities

The equities tip in the Plaintiffs' favor because the Agreement only applies to information "not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any information, which if disclosed, would assist in competition against the Company." *Id.* ¶ 6. Accordingly, the Agreement does not restrict Mereos from using information that is publicly available or generally known in the industry that he acquired during his tenure with GovConnection. Thus, a

preliminary injunction enforcing the Agreement during the pendency of the case would not impose undue hardship on him.

Public Interest

"[T]he public has an interest in enforcing restrictive covenants that protect business interests . . . ." *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005). Because I find, at least preliminarily, that the Agreement is narrowly tailored to protect the Plaintiffs' legitimate business interests, enforcing the Agreement will serve the public interest.

## Conclusion

Plaintiffs have demonstrated that all of the *Winter* factors weigh in favor of granting them preliminary-injunctive relief. I will therefore grant their Motion.

## ORDER

Accordingly, for the reasons stated in this Memorandum Opinion and Order, it is this 22nd day of March, 2017, hereby ORDERED that:

1. Plaintiffs' Emergency Motion for *Ex Parte* Temporary Restraining Oder, which I construe as a Motion for a Preliminary Injunction, IS GRANTED;

2. Defendant IS REQUIRED to comply with the terms of the Agreement, including the provisions on non-disclosure of confidential information;

3. Defendant IS ENJOINED from destroying, deleting, altering, or otherwise failing to preserve any evidence that may be relevant to the resolution of the issues raised in the Verified Complaint;

4. Defendant IS ENJOINED from disseminating Plaintiffs' confidential information, as defined by the Agreement, to any person or entity;

5. Defendant SHALL immediately return to Plaintiffs all of their confidential information and trade secrets, and all documents or information derived from the same, whether in paper form or contained on any external electronic storage devices, including but not limited to any personal computers, tablets, USB devices, or any other electronic storage device and/or media;

6. Defendant SHALL immediately permit an independent computer forensic specialist designated by the Plaintiffs, a representative from Plaintiffs, and Plaintiffs' counsel to obtain access to the Defendant's computers and computer systems, wherever they are located, and make a forensic image of any devices or applications containing electronically stored information ("ESI"), including but not limited to laptop computers, desktop computers, servers, removable media and storage devices, tablets, mobile telephones, backup storage devices and cloud-based applications, in Defendant's possession, custody, and control, and deliver the same to the designated computer forensic specialist and shall provide all cooperation and assistance to enable said forensic images to be made, including but not limited to providing any and all necessary passwords and/or any other authentication information;

7. After forensic imaging is complete, the Parties ARE REQUIRED to engage in discussions regarding the manner in which forensic review will be conducted of the computers and electronic storage devices preserved and forensically copied pursuant to this Order. In the event that the Parties are unable to reach an agreement regarding the protocol for forensic review within seven (7) days of the Order being issued, then the Parties SHALL SUBMIT to the Court their respective proposed versions of the forensic protocol, and the Court shall determine the protocol to be followed;

8. The forensic copies made pursuant to this Order SHALL be held in escrow by Plaintiff's designated forensic expert, pending the parties' agreement, or the Court's Order, regarding the manner in which a forensic review will be conducted;

9. Plaintiffs MAY OBTAIN early discovery if Defendant fails to comply with this Order;

10. Plaintiffs SHALL PROVIDE a copy of this Memorandum Opinion and Order to the Defendant.

                                                    /S/
                                      Paul W. Grimm
                                      United States District Judge

jlb